UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| v. | ) | |
| | ) | |
| ANTHONY DAPOLITO, | ) | Criminal no. 2:12-cr-00045-NT |
| | ) | |
| Defendant. | ) | |

**ORDER ON DEFENDANT'S MOTION TO SUPPRESS**

On March 9, 2012, Portland police officers Dan Knight and Richard Ray stopped and frisked the Defendant, Anthony Dapolito, finding a handgun in his waistband. The officers arrested the Defendant, and he was charged with possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). Before the Court is the Defendant's Motion to Suppress the handgun. Having considered the testimony and evidence presented at the hearing held on July 18, 2012, and counsels' arguments, the Defendant's Motion to Suppress is **GRANTED**.

**FACTS**

In the early morning of March 9, 2012, Officers Ray and Knight were on bicycle patrol in Portland. As they cycled past Monument Square at 2:39 a.m., they noticed the Defendant standing in an alcove in front of Shay's Grill Pub at 18 Monument Square.

From the sidewalk looking toward Shay's, there are two doorways within the alcove. The first doorway, which is roughly in the center of the alcove, is the

entryway for Shay's. To the right of the Shay's entrance is a second door allowing access to condominiums on the upper floors. To the right of the condominium entrance is a small ATM machine, which is shielded by a canvas enclosure. The Defendant was standing in the area directly in front of the door to the condominiums. The officers' encounter with the Defendant took place in an approximately six square foot area in front of the doorway to the condominiums. Their interaction mostly occurred within the area beneath Shay's awning, but occasionally spilled out onto the sidewalk immediately in front of 18 Monument Square.

The encounter began when the officers cycled by and asked the Defendant how he was doing. The Defendant responded "everything's ok," but he was squinting and grimacing. Thinking the Defendant's response was odd, the officers parked their bikes and approached him. Officer Ray testified that one of the reasons he wanted to check on the Defendant was because of burglaries in the area. The "area" was described as most of the downtown and Old Port region of Portland encompassing Commercial Street, Fore Street, Exchange Street, Congress Street and Monument Square. Officer Ray could not confirm whether there had been any burglaries in Monument Square in the past month. Officer Knight testified that he did not see any evidence that the Defendant had been or would be involved in a burglary.

Officer Ray asked the Defendant what he was doing. The Defendant told Officer Ray that he was waiting for his friends. Officer Ray asked for some

2

identification, but the Defendant indicated that he did not have identification on him. Both Officers Ray and Knight thought that the Defendant was under the influence of something, although Officer Ray, who did most of the talking with the Defendant, could not smell any intoxicants. The Defendant seemed nervous. His face was sweaty and his hands were fidgeting. The Defendant kept grimacing, and Officer Knight thought that he may have had some sort of facial tic. Officer Ray testified that the Defendant seemed "off" and that he did not always make sense. At one point, in an apparent reference to the 18 Monument Square address, the Defendant told the officers that if you take 100 away from 118 it is 18.

Officer Ray testified that the Defendant kept looking away from the officers, and it appeared to Officer Ray that he was trying to get away or leave. In his report, Officer Ray noted that: "[h]is mannerisms were peculiar starting with the squinting and grimacing in addition to the nervous fidgeting and looking for an escape route."

Neither Officer Ray nor Officer Knight recognized the Defendant, and they wanted to identify him. Officer Ray asked the Defendant for his name and asked him to spell it. The Defendant spelled his name D-A-P-L-I-T-O and provided a middle initial, "M." Officer Ray also asked for, and the Defendant provided, his actual birthdate. The Defendant told Officer Ray that he was from Saugus, Massachusetts. Officer Knight's report indicates that the Defendant said that he had a Massachusetts driver's license. Officer Ray provided dispatch with this information. Dispatch found no record in either Maine or Massachusetts for "Anthony M. Daplito." Officer Ray told the Defendant that dispatch could not find

3

the name and asked the Defendant if he had his name right. The Defendant spelled his last name again, this time correctly. Officer Ray ran the name by dispatch a second time. Again, dispatch found no record for the Defendant.[1]

Officer Ray testified that he considered it odd that a man in his thirties had no record of either a driver's license or state identification card, and that because he found the absence of any record unusual, he believed that the Defendant was giving a false name. Officer Ray testified that in his experience, a person with an active warrant may provide a false name to avoid being arrested. Officer Ray further testified that he knew that, while odd, the absence of any record for the Defendant was not enough to detain him.[2]

Officer Ray told the Defendant that he thought he was being deceitful and asked if he could pat him down to find identification. The Defendant refused, telling the officers that he did not like to be touched. When asked where he lived, the

---

[1] Officer Ray testified that when dispatch runs a name in the computer system it checks for motor vehicle records as well as National Crime Information Center (NCIC) data, which includes outstanding warrants, bail conditions, and felony conviction history.

[2] MR. BENEMEN: If he had begun to walk away, isn't it fair to say that you would have stopped and detained him?
OFFICER RAY: At which point, when he was not on file?
MR. BENEMAN: At that point, right then and there.
OFFICER RAY: When he was not on file?
MR. BENEMAN: Yes.
OFFICER RAY: No, I couldn't.
MR. BENEMAN: You couldn't?
OFFICER RAY: We were essentially contacting -- it was suspicious but I couldn't -- I had nothing -- right then I just started talking to him, so no.
MR. BENEMAN: What changed from the point when dispatch said that he wasn't on file to the point where you decided to detain him?
OFFICER RAY: His story that he lived there and his friends were coming down and told it was about 20 minutes, so he had -- nobody ever showed up, had no key to get into the building that he said he lived in, those things, his mannerisms. The location of the ATM was a possibility he might have been standing -- trying to do something with that.

4

Defendant responded that he lived at 18 Monument Square with some male roommates. The Defendant said that he had telephone numbers for his roommates in his cell phone, but his cell phone was dead so he could not access their numbers. The Defendant also told the officers that he did not have keys to get into the building. At one point, Officer Knight pushed the buzzer at number 18, but no one responded.

Officer Ray asked a second time if he could search the Defendant for identification. The Defendant again refused. Officer Ray observed what looked like a card in the Defendant's left front pocket and asked him about it. The Defendant pulled the card out and handed it to Officer Ray. It was a Massachusetts EBT card[3] with the name "Anthony Dapolito" on it. Officer Ray testified that he still believed the Defendant was giving a false name because the EBT card did not have a photo or date of birth on it.

At 2:54 a.m., after the officers had been speaking with the Defendant for about 15 minutes, Officer Christopher Dyer joined Officers Ray and Knight. He drove his police cruiser onto Monument Square, where vehicles are usually prohibited, stopped the car, got out, and observed the conversation between the officers and the Defendant, which, according to Officer Dyer, was not "going smoothly." Officer Dyer approached Officers Ray and Knight and the Defendant. He noted that the Defendant appeared to be under the influence of drugs or alcohol.

---

[3] An Electronic Benefits Transfer card, or EBT card, is a state-issued debit card that is used to access federal Supplemental Nutrition Assistance Program benefits.

5

Officer Knight testified that because things were not adding up, the officers decided to detain the Defendant and take him to the county jail in Officer Dyer's cruiser in order to get "a little more time" in a safer environment. Officer Ray testified that at the Cumberland County Jail, the officers could fingerprint the Defendant or look for him in a tattoo record. Officer Ray told the Defendant that they were taking him to the county jail to identify him and search him for identification.[4] The Defendant's eyes grew wider, and he stood up taller. Each of the officers testified that the Defendant moved into a "bladed" stance, which their training and experience told them meant that the Defendant was preparing either to fight or flee. The Defendant turned slightly away from the officers and said that he "didn't want that." He asked the officers if he could take three steps back. Officer Ray told the Defendant that he could not take three steps back and that they needed to detain him.[5] He told the Defendant to put his hands on his head. When the Defendant did not comply, Officer Ray repeated the command. Officer Knight

---

[4] Officer Ray repeatedly testified that his plan was to detain the Defendant to find out who he was so he could determine if there were any active warrants for him. For example:

> MR. BENEMAN: Your testimony on direct examination was that, because of these various concerns that you voiced, you were going to place him in a police car and take him to the Cumberland County Jail, correct?
> OFFICER RAY: Yes.
> MR. BENEMAN: What were you going to be arresting him for?
> OFFICER RAY: We were detaining him to positive ID who he was, because of the thought -- the belief that he could be wanted and he was being deceitful about that.

Officer Ray's incident report also indicated that he wanted to detain the Defendant to determine his identity: "Due to nothing that he provided us, as to who he was or why he was there adding up, I deemed it necessary to detain him in order to discover his identity. I believed he could possibly be a burglar or a wanted person using a fake name to evade capture."

[5] Officer Knight testified that he had never had someone ask to have space before, and this question indicated to him that the Defendant had a weapon and planned to use it.

took out his Taser and trained its red light on the Defendant's chest. The Defendant put his hands on his head. Officer Ray held the Defendant's hands behind his back and began to pat him down.

Officer Ray provided conflicting testimony on the purpose of the pat down. Although his report indicates that he told the Defendant that he was going to detain him to search for identification, Officer Ray testified that he "miswrote" his intentions and that he actually intended to search the Defendant for officer safety. He also testified that the purpose of the search was for "weapons, for safety, to take him in the car." Officers Knight and Dyer both testified that the pat down of the Defendant was for officer safety.

When the Defendant put his hands on his head, Officer Dyer observed what looked like the handle of a gun and grabbed the weapon. After the gun — a pistol loaded with five rounds of ammunition — was found, the officers arrested the Defendant.

Officer Dyer transported the Defendant to the Cumberland County Jail. Prior to the Defendant's arrest, the officers had questioned him for about 20 minutes.

At the Cumberland County Jail, the Defendant provided his name, birthdate and social security number. Dispatch searched for the Defendant in the Interstate Identification Index, which, for the first time, confirmed his identity and related that the Defendant is a convicted felon.

## DISCUSSION

I. **Overview of the Law**

The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. As the First Circuit has explained: "This constitutional assurance does not prohibit all searches and seizures but, rather, only those that are unreasonable." *United States v. Pontoo*, 666 F.3d 30, 27 (1st Cir. 2011).

Interactions between the police and citizens generally fall "within three tiers of Fourth Amendment analysis, depending on the level of police intrusion into a person's privacy." *United States v. Young*, 105 F.3d 1, 5 (1st Cir. 1997). The lowest tier, often called a consensual encounter, does not trigger the protections of the Fourth Amendment. The middle tier, referred to as an investigative or *Terry* stop, *see Terry v. Ohio,* 392 U.S. 1 (1968), allows police to detain an individual briefly but must be supported by a reasonable, articulable suspicion that the seized individual is engaged in criminal activity. The third tier of interaction is an arrest or *de facto* arrest, which must be supported by probable cause to believe that the suspect has committed a crime.

The police do not implicate the Fourth Amendment when they approach citizens on the street and ask them questions. *Florida v. Bostick*, 501 U.S. 429, 434 (1991); *Young*, 105 F.3d at 6. "Police conduct falls short of triggering Fourth Amendment protections when, from the totality of the circumstances, we determine that the subject of any police interaction would have felt free to terminate the

conversation and proceed along his way." *Young*, 105 F.3d at 6 (internal citations omitted); *see Bostick*, 105 U.S. at 434.

"[A] brief investigatory stop based on a reasonable suspicion that criminal activity may be afoot does not violate the Fourth Amendment, even in the absence of probable cause." *Pontoo*, 666 F.3d at 27. Such an investigatory detention "occurs when a police officer, acting on reasonable and articulable suspicion of criminal activity, briefly detains an individual to confirm or dispel his suspicion." *Young*, 105 F.3d at 6*; see Terry v. Ohio*, 392 U.S. 1 (1968). In *United States v. Brake*, 666 F.3d 800 (1st Cir. 2011), the First Circuit explained, "[r]easonable suspicion must be more than a hunch but need not amount to probable cause. More definitively, the officer must have a particularized and objective basis for suspecting the person stopped of criminal activity, rooted firmly in 'specific and articulable facts.'" *Brake*, 666 F.3d at 804 (quoting *Pontoo*, 666 F.3d at 25-26).

A two-pronged test must be met for a *Terry* stop to be valid: 1) "the stop must be justified at its inception," and 2) the officers' actions "must be 'reasonably related in scope to the circumstances which justified the interference.'" *Pontoo*, 666 F.3d at 26 (internal citations omitted) (*quoting United States v. Acosta-Colon*, 157 F.3d 9, 14 (1st Cir. 1998)). The Court evaluates the "totality of the circumstances" to determine whether a *Terry* stop is "justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 41, 417 (1981). *See United States v. Camacho*, 661 F.3d 718, 726-27 (1st Cir. 2011) (police, responding to reports of gang fight, lacked reasonable

9

suspicion to stop two men walking away from fight despite fact that defendant's clothing was wet and his breathing labored).

"[A]n initially consensual encounter between a police officer and a citizen can be transformed into a seizure or detention within the meaning of the Fourth Amendment, 'if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *I.N.S. v. Delgado*, 466 U.S. 210, 215 (1984) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). The line of demarcation between a consensual encounter and an investigatory detention is drawn at the point where a reasonable person would feel that they are no longer free to refuse to answer and walk away. *See United States v. Espinoza*, 490 F.3d 41, 48-50 (1st Cir. 2007) (defendant seized by officer who walked up to an idling van containing the defendant, flashed his badge, identified himself as an immigration officer, asked for identification, and directed the driver to shut off the engine); *United States v. Smith*, 423 F.3d 25, 29-30 (1st Cir. 2005) (exiting cruiser and asking individual for identification did not change a consensual encounter into an investigatory stop where officers did not touch individual, question him about a specific event, or use tone of voice indicating that he was compelled to stay and answer officers' questions).

The Supreme Court has addressed the issue of whether the police can insist on identification on several occasions. "In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment," *Hiibel v. Sixth Judicial Dist. Court of Nev.*, 542 U.S. 177, 185 (2004), but a police

officer "cannot stop a citizen and demand identification 'without any specific basis for believing he is involved in criminal activity.'" *United States v. Henderson*, 463 F.3d 27, 45 (1st Cir. 2006) (*quoting Brown v. Texas*, 443 U.S. 47, 52 (1979)); *see Hiibel*, 542 U.S. at 186-87. "[I]f there are articulable facts supporting a reasonable suspicion that a person has committed a criminal offense, that person may be stopped in order to detain him, to question him briefly, or to detain him briefly while attempting to obtain additional information." *Hayes v. Florida*, 470 U.S. 811, 816 (1985).

In *Brown*, the police stopped a man who was observed walking away from another man in an alley in an El Paso neighborhood frequented by drug users. The officers asked Brown for identification. When Brown refused to provide identification, the police arrested him for violating a Texas statute that requires individuals who are lawfully stopped by the police to provide a name and address. The officer acknowledged that he stopped Brown only because he wanted to identify him. Because the officers lacked any reasonable suspicion to believe that Brown was engaged in any criminal conduct, the Supreme Court reversed Brown's conviction. In so doing, it concluded:

> In the absence of any basis for suspecting appellant of misconduct, the balance between the public interest and appellant's right to personal security and privacy tilts in favor of freedom from police interference. The Texas statute under which appellant was stopped and required to identify himself is designed to advance a weighty social objective in large metropolitan centers: prevention of crime. But even assuming that purpose is served to some degree by stopping and demanding identification from an individual without any specific basis for believing he is involved in criminal activity, the guarantees of the Fourth Amendment do not allow it. When such a stop is not based on

> objective criteria, the risk of arbitrary and abusive police practices exceeds tolerable limits.

*Id.* at 52 (citation omitted).

In *Hiibel*, the Supreme Court held that the police may demand identification during a lawful *Terry* stop. The defendant was arrested for obstruction because he refused to provide his identity to the police during a valid *Terry* stop. Hiibel argued that Nevada's "stop and identify" statute, which requires a person detained by the police to disclose his identity, violated the Fourth Amendment. The Court disagreed, rejecting the defendant's concern that the statute permitted the police to arrest a person for being suspicious. "Petitioner's concerns are met by the requirement that a *Terry* stop must be justified at its inception and 'reasonably related in scope to the circumstances which justified' the initial stop." *Id.* (quoting *Terry*, 392 U.S. at 20).

In *Henderson*, the First Circuit addressed a case in which police demanded identification from a passenger in a car that had been stopped for various driving infractions. The police officer asked for the passenger's identification, and when the passenger said he did not have identification, the officer demanded the passenger's name and address. The officer discovered an outstanding warrant and arrested the passenger on the warrant. During a search incident to arrest, the officer found the passenger to be in possession of a firearm. The First Circuit found that the driver's underlying traffic violation did not "raise the specter of criminal activity" involving the passenger. *Henderson*, 463 F.3d at 47. Because the officer did not have

12

reasonable and articulable suspicion to detain the passenger,[6] the officer's investigative detention of the passenger, including his demand of the passenger's identification, exceeded the scope of a valid *Terry* stop. The First Circuit reversed the trial court's denial of the suppression motion and vacated the conviction.

The Fourth Amendment does not permit police officers to base their reasonable suspicion on a person's refusal to provide his name or identification. *Florida v. Royer*, 460 U.S. 491, 498 (1983) (during consensual encounter, a person's refusal to answer does not, without more, furnish reasonable, objective grounds for detention).

## II. Application of the Law to the Facts

### A. When the *Terry* Stop began.

In this case, the parties agree that the interaction began as a consensual encounter and evolved into a *Terry* stop, but they disagree about when the transformation occurred, and whether the police had a reasonable articulable suspicion that the Defendant was engaged in criminal behavior at the inception of the detention. The Defendant argues that the *Terry* stop began once the officers had the Defendant's correctly spelled name yet continued to question him. The government argues that the *Terry* stop began when Officer Ray announced that they were going to take the Defendant in Officer Dyer's cruiser to the Cumberland County Jail.

---

[6] The district court had credited dubious testimony that the officer had asked for identification because he was going to cite the passenger for failure to wear a seatbelt. The First Circuit held that the district court's credibility finding was clearly erroneous.

13

The Defendant was initially approached by two uniformed officers in the small alcove in front of 18 Monument Square. The Court finds that although the Defendant was not completely blocked in, his egress was impaired. Officer Ray's report, describing the Defendant as "looking for an escape route," suggests that the Defendant was somewhat confined.

While the initial encounter was casual, the interaction intensified after the Defendant had correctly spelled his name and the dispatcher had relayed the information that there was no record found. At that point, Officer Ray's questioning became accusatory, and Officer Ray told the Defendant that he believed the Defendant was lying. After about fifteen minutes of questioning, and after the production of the EBT card did not dispel the officers' suspicions, it would have been obvious to any reasonable person that the police were not going to let him go. The Court finds that the consensual encounter had transformed into an investigatory detention by this point. By the time Officer Dyer drove his cruiser up onto Monument Square, increasing further the intensity of the encounter, the *Terry* stop had already begun.

> **B. The Police Lacked Reasonable Articulable Suspicion at the Inception of the Terry Stop.**

The police did not have "a particularized and objective basis . . . rooted firmly in 'specific and articulable facts'" that the Defendant was engaging in criminal activity at the inception of the *Terry* stop. *Brake*, 666 F.3d at 804 (quoting *Pontoo*, 666 F.3d at 25-26). A *Terry* stop must be justified at its inception by "some objective manifestation that the person stopped is, or is about to be, engaged in criminal

14

activity." *Cortez,* 449 U.S. at 417. What the officers had was an odd, grimacing, impaired man, who was unknown to them and who was not making much sense. The Defendant was acting not unlike many other members of the indigent and/or transient population of Portland. The officers suspected that something was "off," but they could not put a finger on it. Officer Knight called it "a police sense that something wasn't right." The Court calls it a good hunch.

The first justification that Officers Ray and Knight provided to support their stop was that they suspected that the Defendant might be involved in a burglary. Yet neither officer could identify any burglaries that had occurred in Monument Square in the month prior to the arrest, much less any burglaries the evening they encountered the Defendant. There were no tips or sources of information linking the Defendant to burglaries. The officers saw no tools on or near the Defendant that would link him to a burglary. Other than standing near an ATM, the Defendant was doing nothing that suggested that he had committed or was going to commit a burglary. The burglary justification did not support the *Terry* stop.

The second justification offered for the stop was that the officers suspected that the Defendant was wanted on a warrant and that he was lying about his true identity. Again, the officers had scant evidence to support their suspicions. The officers had received no tip or information that the Defendant was wanted. *United States v. Hensley,* 469 U.S. 221, 229 (1985) ("wanted flyer" sent to police departments provided reasonable suspicion that defendant was wanted). The primary basis for their suspicion was that dispatch could find no record for him.

Officer Ray said that he considered it odd that a man in his thirties had no driver's license or state identification card, and he suspected that the Defendant was giving a false name because he was wanted on an outstanding warrant. But it is clear from Officer Knight's report that the Defendant told the officers that he did have a Massachusetts driver's license. Rather than delve into the reasons why the system reported no record when the Defendant said he was licensed in Massachusetts, Officer Knight assumed the Defendant was lying about his identity. Even after the point where the Defendant produced an EBT card in the name of Anthony Dapolito, Officer Ray persisted with his theory that the Defendant was wanted on an outstanding warrant.

The Government points to the fact that the Defendant misspelled his own name when first asked. But given the description by the officers of the Defendant's condition, the Court cannot infer that he deliberately misspelled his name to shield his true identity, particularly since, when asked a second time, he spelled his name correctly and he turned over an EBT card in the name of Anthony Dapolito. Given these facts, the Court concludes that it is more likely that the Defendant either unintentionally misspelled his name the first time or that Officer Ray misheard him.

There was also some testimony that the use of a middle initial "M" might have thrown off the record search. Officer Ray testified that the Defendant did not have the middle initial "M" on records he reviewed post-arrest. But, Officer Ray did not indicate which records he reviewed, and there was no other evidence offered of

whether the Defendant has a middle name or what his middle initial is. Nor was there any evidence of the sophistication of the search engines used by dispatch or whether they required letter-for-letter accuracy. The fact that dispatch found no record of the Defendant, even coupled with his odd behavior and his implausible account of where he lived, did not constitute a particularized and objective basis for suspecting that the Defendant was wanted on an outstanding warrant.

The police articulated no other suspicion than generalized suspicion and unsupported suspicions of burglary and an outstanding warrant. The officers observed no criminal behavior and had no tips or sources of information notifying them that the Defendant was engaging in any other crime. The officers saw no contraband and no indication of a weapon. Although the Defendant seemed jumbled and impaired, he was apparently not behaving in a way that would warrant an arrest for public intoxication, disorderly conduct, loitering, or trespass. The Defendant's story that he lived with friends in a condominium at 18 Monument Square was not adding up, but the police had noted that the Defendant was not making much sense in general. Even if the story was not truthful, the Government made no claim that such a false statement would be criminal. Under the totality of the circumstances and viewed through the lens of a reasonable police officer, the Court cannot find that the police had a particularized and objective basis grounded in specific and articulable facts that the Defendant had been, was, or was about to be engaged in criminal activity.

Officer Ray's report and the officers' testimony make clear that the officers' primary goal was to identify the Defendant. The officers were prepared to pat down, handcuff, and transport the Defendant to the jail in order to continue their search for identification.[7] But *Brown* and *Hiibel* make clear that the police cannot demand identification unless they have a reasonable, articulable suspicion of criminal activity to support a *Terry* stop in the first place. The officers' continued determination to identify the Defendant was, absent any additional basis for suspecting the Defendant of involvement in criminal activity, insufficient to justify a *Terry* stop.

C. **The Scope of the Stop**

"After a valid *Terry* stop, a police officer may conduct a protective frisk or pat-down search if 'the officer is justified in believing that the person is armed and dangerous to the officer or others.'" *Camacho*, 661 F.3d at 728 (quoting *United States v. Romain*, 393 F.3d 63, 71 (1st Cir. 2004) (quoting *United States v. Schiavo,* 29 F.3d 6, 8 (1st Cir. 1994) (internal quotation marks omitted)). The stop must also be "reasonably related in scope to the circumstances which justified the interference." *United States v. Acosta-Colon*, 157 F.3d 9, 14 (1st Cir. 1998). Because

---

[7] Government counsel argued that the police, as part of a *Terry* stop, may handcuff a suspect and take him to the police station or the jail to verify his identity. In support of this argument, the Government cited *United States v. Dingle-Jones*, Crim. No. 08-202-P-H, 2009 WL 230093 (D. Me. Jan. 30, 2009). The Court believes that *Dingle-Jones* should be strictly limited to its facts, and notes that in *Dingle-Jones* the court found probable cause for an arrest. Generally a non-consensual trip to the police station would constitute an arrest that would require the police to have probable cause that the suspect has committed a crime. *Hayes*, 470 U.S. at 816 ("our view continues to be that the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes. We adhere to the view that such seizures, at least where not under judicial supervision, are sufficiently like arrests to invoke the traditional rule that arrests may constitutionally be made only on probable cause.")

the Court finds that the *Terry* stop was not supported by reasonable articulable suspicion at its inception, it need not address whether the officers' actions were reasonably related in scope to the circumstances that justified the interference or whether the frisk of the Defendant was justified by a concern for officer safety. *Terry*, 392 U.S. at 24; *Brake*, 666 F.3d at 804 (pat-down frisk must be grounded on specific, articulable facts).

### D. Suppression of the Handgun

Evidence found as a direct or indirect result of invalid police conduct may not be used unless it is discovered "by means sufficiently distinguishable to be purged of the primary taint," W*ong Sun v. United States*, 371 U.S. 471, 485 (1963), or "the connection between the illegal police conduct and the discovery and seizure of the evidence is 'so attenuated as to dissipate the taint.'" *Segura v. United States*, 468 U.S. 796, 805 (1984) (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1990)). In *Camacho*, the First Circuit held that a gun found during a frisk conducted after an invalid stop should be suppressed, regardless of whether the officer reasonably believed the suspect posed a threat to the officer's safety, because the frisk flowed directly from the invalid stop. *Id.* at 728 ("Discovery of the gun flowed directly from the original unlawful seizure of Camacho and was not 'so attenuated as to dissipate the taint' of the initial unlawful stop*."). See also Arizona v. Johnson,* 555 U.S. 323, 326 (2009).

The officers' frisk of the Defendant and the discovery of the gun was the direct result of the invalid *Terry* stop. There was no intervening time or conduct

that could dissipate the taint of the invalid *Terry* stop from the frisk of the Defendant and discovery of the gun or provide an independent basis for discovering the gun.  The handgun found during the officers' frisk of the Defendant is a fruit of the invalid *Terry* stop and should be suppressed.

## CONCLUSION

For the reasons stated above, the Defendant's Motion to Suppress is hereby **GRANTED**.

SO ORDERED.

Dated this 21st day of August, 2012.

/s/ Nancy Torresen
United States District Judge